# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **NORRIS GILES**, | Case No. 6:15-cv-515-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **CONMED HEALTHCARE MANAGEMENT, INC. and DR. CARLA ANTOLA**, | |
| Defendants. | |

Ethan Levi, Jesse Merrithew, and Noah Horst, LEVI MERRITHEW HORST PC, 610 SW Alder Street, Suite 415, Portland, OR 97205. Of Attorneys for Plaintiff.

Lindsey H. Hughes and Jamie Edward Valentine, KEATING JONES HUGHES PC, One SW Columbia, Suite 800, Portland, OR 97258. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

      Plaintiff Norris Giles ("Plaintiff") brings this suit against Defendants Conmed Healthcare Management, Inc. ("Conmed") and Dr. Carla Antola ("Dr. Antola") (collectively, "Defendants"), alleging two claims: deliberate indifference to Plaintiff's serious medical needs in violation of 42 U.S.C. § 1983 ("Section 1983") and professional medical negligence. Before the Court is Defendants' motion for summary judgment against both claims. For the reasons discussed below, Defendants' motion is granted in part and denied in part. The Court grants summary judgment against Plaintiff's Section 1983 claim, but Plaintiff may proceed on his negligence claim.

PAGE 1 – OPINION AND ORDER

**STANDARDS**

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

**BACKGROUND**

Plaintiff was incarcerated at the Coos County Jail (the "Jail") from February 28, 2013, to March 27, 2013. During his incarceration, Plaintiff was under the medical care of Dr. Antola and other medical staff also employed by Conmed. Viewed in the light most favorable to Plaintiff, the facts are as follws.

When Plaintiff first arrived at the jail on February 28, he believed that he was suffering from food poisoning. ECF 45-1 at 9:15-18. Dr. Antola first examined Plaintiff on March 1. ECF 41-2 at 1. Plaintiff told Dr. Antola that he had abdominal pain and nausea, was vomiting, and had experienced no bowel movements except for blood for the past two days. ECF 41-1 at 5; ECF 41-2 at 1. In her notes for that examination, Dr. Antola wrote that Plaintiff suffered from

PAGE 2 – OPINION AND ORDER

diabetes, which had been uncontrolled for many years. ECF 41-2 at 1. Dr. Antola made a differential diagnosis of "gastroparesis versus food poisoning versus bowel obstruction." ECF 41-2 at 1. Dr. Antola placed Plaintiff on diet of clear liquids for three days. ECF 41-2 at 1.

Between March 1 and March 7, Plaintiff was housed in the Jail's general population. *See* ECF 41-5 at 1-3. On March 5, Plaintiff sent a health services request, also called a "kite," complaining of "severe stomach pains" and vomit that smelled like feces. ECF 41-3 at 2-3. Dr. Antola responded to the kite by extending Plaintiff's liquid diet indefinitely, explaining "when we treat you for your condition . . . you become upset and throw your food away. . . . I don't think you are as sick as you claim to be." ECF 41-3 at 2. On March 6, Plaintiff signed a refusal of treatment form, declining his prescribed liquid and diabetic diets. ECF 41-4 at 1. Plaintiff stated that he was refusing treatment because his prescribed diet did not give him "enough to eat." ECF 41-4 at 1.

On March 7, Plaintiff complained of dizziness while eating or even seeing food. ECF 41-5 at 3. Plaintiff was transferred to the booking unit at the Jail for medical observation, where he remained until March 12. ECF 41-5 at 6. On March 8, Plaintiff had his second visit with Dr. Antola. ECF 41-2 at 5. Plaintiff complained of constipation and dizziness after eating. ECF 41-2 at 5. Dr. Antola told Plaintiff that his symptoms were likely due to his high blood sugar levels; Dr. Antola suggested that Plaintiff stick to his diabetic diet and remain on medical lockdown until his blood sugar was below 200. ECF 41-2 at 5. Plaintiff became agitated and called the medical staff, including Dr. Antola, "quacks." ECF 41-2 at 5. Plaintiff signed another refusal of treatment form, expressly refusing the "[n]on-insulin diabetic diet" and "blood glucose checks." ECF 41-4 at 2. On March 11, Plaintiff apologized to Nurse Marjory Hausler ("Nurse Hausler") for his behavior during his March 8 appointment. ECF 41-2 at 6.

PAGE 3 – OPINION AND ORDER

During the early morning of March 12, Plaintiff sent a kite complaining about the kinds and amount of food being sent to him on his diabetic meal trays. ECF 41-8 at 4-5. Dr. Antola replied in writing:

> Foremost you need to understand this is a jail not a hotel with room service. Your diabetic diet has been accommodated to the best of the jail capabilities—you also keep contradicting yourself regarding the diet—you told us you "know" they serve the same food on regular and diabetic trays—now you are saying the opposite—Now you say you are starving; before you were nauseated. Please keep your story straight so we can help you better in your medical needs.

ECF 41-8 at 4. Later that day of March 12th, Dr. Antola saw Plaintiff for the third time. In her medical notes for this examination, Dr. Antola wrote that Plaintiff was not "constant with his history." ECF 41-2 at 7. During her deposition, she explained that the fact that Plaintiff was "changing his story about his symptoms might mean that he's exaggerating his symptoms." ECF 41-1 at 9. Dr. Antola noted that Plaintiff was "rude" and "argumentative," called medical staff "quacks," and made "quacking" noises directed at the staff. ECF 41-5 at 6. Dr. Antola advised Plaintiff to continue his regular blood sugar testing and released Plaintiff back into the general Jail population, where he remained for the rest of his time in custody. *See* ECF 41-1 at 9; ECF 41-5 at 6.

Dr. Antola did not personally examine Plaintiff again until March 26, although she continued to oversee his care. *See* ECF 45-8 at 28:19-29:13. Between March 12 and March 26, Plaintiff repeatedly complained to medical and Jail staff about his prescribed diabetic diet and blood sugar testing. Plaintiff also continued to complain about his symptoms, including, stomach pain, nausea, vomiting, constipation, and uncontrollable diarrhea.

On March 14, Plaintiff requested to be removed from his diabetic diet. ECF 41-2 at 8. An Emergency Medical Technician ("EMT") then spoke with Plaintiff, who apologized and said he

PAGE 4 – OPINION AND ORDER

actually did want to stay on the special diet. ECF 41-2 at 8. Plaintiff also sent a kite stating, "I want to say that I am sorry to the whole entire medical staff for all the mean—foul and evil words that has [sic] come out of my mouth." ECF 41-3 at 8.

On the afternoon of March 15, Nurse Hausler noted that Plaintiff's blood sugar was in the "target" range. ECF 41-2 at 9. After being in "the yard," where he had access to commissary foods, Plaintiff complained to staff of abdominal pain. ECF 41-2 at 9. Nurse Hausler concluded that when Plaintiff was in the general population he would complain of various ailments that would then improve when he was in medical isolation. ECF 41-2 at 9. While consulting with Dr. Antola about these observations, Nurse Hausler noted that Dr. Antola mentioned possibly doing bloodwork the following week to check for pancreatitis. ECF 41-2 at 9.

On the night of March 15, an EMT responded to Plaintiff's cell and found him lying in the "rescue position" with "vomit going down his blanket across his bed and to the floor." ECF 41-2 at 10. Plaintiff told the EMT, "You guys keep thinking it's my blood sugar. It's my stomach." ECF 41-2 at 10. Plaintiff also told the EMT that he was lying in his own feces. ECF 41-2 at 10. Plaintiff demanded to be taken to the hospital, but the medical staff refused. ECF 41-2 at 11-12. At some earlier date, Dr. Antola had told the medical staff that Plaintiff would not be taken to the hospital unless his vomit looked like "ground up coffee beans." *See* ECF 41-2 at 11; ECF 47-5 at 10. That night, Plaintiff sent a kite requesting to be removed from the diabetic diet, refusing further tests of his blood sugar, and stating that "someone on this jail staff is poisoning my food and drinks." ECF 41-3 at 10-11.

On March 16, Plaintiff spoke to a friend on the phone and told her that he thought he was constipated. ECF 41-7 at 3. His friend, who had no medical training, suggested that Plaintiff might have an intestinal blockage. ECF 41-7 at 3. Plaintiff claims he took his friend's concerns

PAGE 5 – OPINION AND ORDER

seriously, but also that he continued to be unsure what was wrong with him. ECF 41-7 at 3; ECF 45-1 at 14:10-14. That afternoon, a Jail deputy reported seeing an empty wrapper for fudge cookies in Plaintiff's cell and Plaintiff sitting in bed with his legs twitching. ECF 45-9 at 4. When asked what was going on, Plaintiff told the deputy that his "stomach is about to blow up." ECF 45-9 at 4. Plaintiff also said that he did not want medical notified because they would not do anything to help, and that he "would rather die right here than be seen by them." ECF 45-9 at 4. Despite Plaintiff's request to the contrary, the Jail deputy reported the incident to an EMT. ECF 41-2 at 14. Later that day, Plaintiff sent a kite to medical requesting to be removed from the special diet and stating "you are not my Dr. or Nurses". ECF 41-3 at 12-13.

On March 17, Plaintiff sent a kite to the medical staff, asking why his blood sugar testing had been discontinued and requesting that it resume. ECF 41-3 at 14. In her response to Plaintiff's kite, Nurse Hausler noted that Plaintiff had said on March 15 that he would accept no more blood testing; she then ordered that Plaintiff's testing be resumed. ECF 41-3 at 14. Also on March 17, a group of inmates in Plaintiff's cell block sent a non-medical kite stating that they were concerned about their personal safety because of Plaintiff's apparent sickness. ECF 50-1 at 1. The inmates complained that Plaintiff "track[ed] feces around the block." ECF 50-1 at 1.

On March 18, Plaintiff sent a kite requesting to be placed back on a liquid diet because of his vomiting, heartburn, and light-headedness whenever he ate. ECF 41-3 at 15. Dr. Antola responded that Plaintiff was "making [himself] sick" by taking milk of magnesia when the medical staff twice had told Plaintiff to stop. ECF 41-3 at 15. Dr. Antola also wrote, "You keep changing your story and symptoms, we cannot rely on you anymore." ECF 41-3 at 15. On March 19, Plaintiff sent a kite informing the medical staff that he had "begun the process to file a [habeas corpus petition] with the courts on the grounds that my Civil and Constitutional rights

are being violated by the Coos County Jail's medical staff." ECF 41-3 at 16. Plaintiff asserted that his rights were being violated by the "unhealthy" foods included in his diabetic diet and the cell restrictions prohibiting him from eating with other inmates. ECF 41-3 at 16-17. The next day, Plaintiff informed Jail staff that he would not be filing his petition. ECF 41-8 at 10.

On March 21, Plaintiff sent a kite stating that he would no longer be asking for or accepting medical advice "from a bunch of vindictive, ego tripping, unloving bunch of wannabe medical professionals." ECF 41-3 at 20. On March 23, Plaintiff sent a kite apologizing for his statements and behavior and asking for medical attention. ECF 41-8 at 19-20. An EMT responded to Plaintiff's cell, informing Plaintiff that the Jail was out of Mylanta because Plaintiff had overused it and asking him what he had eaten that day. ECF 41-2 at 16. Plaintiff became upset and walked away, stating, "F--- you guys and all this stuff. I'm just going to ride it out. Kiss my ass." ECF 41-2 at 16. Plaintiff also stated that he believed someone on the Jail's staff was trying to poison him. ECF 41-2 at 16.

On March 25, Plaintiff sent a kite to the medical staff, complaining of "constant heartburn, constipation, and swelling in [his] feet," and he asked "to see" the doctor. ECF 41-3 at 21. Dr. Antola examined Plaintiff on March 26. ECF 41-2 at 17. This was Plaintiff's fourth examination by Dr. Antola that month. Plaintiff began his visit by "apologizing for his behavior." ECF 41-2 at 17. Dr. Antola told Plaintiff to "leave this in the past and move on." ECF 41-2 at 17. During the appointment, Plaintiff claimed that his "weight prior to incarceration was 140 pounds." ECF 41-2 at 17.

Although Plaintiff weighed 101 pounds on March 26, Dr. Antola did consider Plaintiff to appear malnourished. ECF 41-1 at 14; ECF 41-2 at 17. Plaintiff told Dr. Antola that he "vomits occasionally, but for the most part he puts his fingers down his throat to provoke vomiting

PAGE 7 – OPINION AND ORDER

hoping this will relieve his heartburn." ECF 41-2 at 17. Dr. Antola diagnosed Plaintiff with multifactorial gastrointestinal reflux disease, with "[a]lcohol and drugs," and maybe "diabetes too," "likely hav[ing] a big role." ECF 41-2 at 18. Dr. Antola prescribed Omeprazole and ordered blood tests. ECF 41-2 at 18. Dr. Antola states that Nurse Hausler did not obtain a blood sample during his examination on March 26 because Plaintiff left the room before the she could draw his blood. ECF 45-8 at 30:4-9.

On March 27, 2013, Plaintiff was released before Nurse Hausler arrived at the Jail. ECF 41-2 at 19; ECF 45-2 at 2. During the process of being released, Plaintiff apologized to an EMT for how he had acted and thanked the medical staff for still being willing to treat him. ECF 41-2 at 18. After he was released, Plaintiff collapsed outside the Jail. ECF 45-1 at 22:5-7. An ambulance responded and brought Plaintiff to the hospital. ECF 45-1 at 23:2-4. The emergency room doctor found Plaintiff dehydrated, malnourished, and in acute renal failure.[1] ECF 45-15 at 2. The doctor performed a CT scan, found a bowel obstruction, and ordered same-day surgery for Plaintiff. ECF 45-15 at 2. Plaintiff was kept in the hospital for thirteen days, during which time he suffered from post-operative infection, fevers, and bed sores. ECF 45-15 at 2.

## DISCUSSION

Plaintiff filed his lawsuit on March 27, 2015, alleging that Dr. Antola denied his Eighth and Fourteenth Amendment rights in violation of Section 1983 and that Defendants also were liable for medical negligence under Oregon common law. ECF 1.[2] Defendants move for

---

[1] On March 26, Dr. Antola thought Plaintiff was "most likely not" in acute renal failure because Plaintiff did not look dehydrated to her. ECF 41-1 at 14; ECF 41-2 at 17. Nevertheless, Dr. Antola admits that "with the diabetes you can have chronic renal failure and not necessarily see it." ECF 41-1 at 14.

[2] In his Complaint, Plaintiff alleged additional claims and defendants. ECF 1. These claims and defendants, however, have since been dismissed. ECF 29; ECF 38; ECF 43.

PAGE 8 – OPINION AND ORDER

summary judgment on two grounds. First, Defendants argue that the applicable two-year statute of limitations bars Plaintiff's claims. Plaintiff responds that his claims did not accrue and the statute of limitations did not begin to run until March 27, 2013, either because Plaintiff did not know of his injuries until he left the Jail and went to the hospital or because Defendants' actions constituted a continuing tort that ended when Plaintiff left the Jail. Second, Dr. Antola argues that she is entitled to summary judgment against Plaintiff's Section 1983 claim because there is no evidence of deliberate indifference.

**A. Plaintiff's Section 1983 Claim Against Dr. Antola**

The government has an obligation "to provide medical care to those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). Deliberate indifference to serious medical needs constitutes unnecessary and wanton infliction of pain, which is proscribed by the Eighth Amendment against the federal government and by the Fourteenth Amendment against state and local governments. *Id.* at 104. Proof of deliberate indifference, however, requires meeting a "high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir.2004). A showing of medical malpractice, negligence, or even gross negligence is insufficient to establish a constitutional violation. *Id*. Similarly, a difference in medical opinion as to the sufficiency of treatment does not establish deliberate indifference. *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996).

The test for deliberate indifference consists of both an objective component and a subjective component. *Toguchi*, 391 F.3d at 1057. First, the plaintiff must show "'a serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.'" *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *Estelle*, 429 U.S. at 104). Second, the plaintiff must show both that the defendant was subjectively aware of the serious medical need and responded

PAGE 9 – OPINION AND ORDER

with deliberate indifference. *See Farmer v. Brennan*, 511 U.S. 825, 829, 837 (1994); *Jett*, 439 F.3d at 1096. In other words, "[the defendant] must both be aware of facts from which the inference could be drawn that a [serious medical need] exists, *and he must also draw the inference.*" *See Farmer*, 511 U.S. at 837 (emphasis added). Thus, deliberate indifference requires "a purposeful act or failure to respond to a prisoner's pain or possible medical need." *Id.* at 1081.

Even assuming that Plaintiff had a serious medical need, Plaintiff presents no evidence that Dr. Antola ever subjectively believed that he had a serious medical need that she was not sufficiently treating. When Plaintiff entered the Jail, he complained of a stomach ailment. Dr. Antola treated Plaintiff's ailment by placing him on a diabetic diet and ordering regular checks of his blood sugar level.[3] Throughout his incarceration, Plaintiff would reject and then accept his prescribed treatment, which made it difficult for any doctor to determine whether Plaintiff's treatment was working and sufficient.

Although Plaintiff repeatedly complained to Dr. Antola and other medical staff about his condition throughout his incarceration, Dr. Antola informed Plaintiff that she did not believe his complaints. ECF 41-3 at 2 ("I don't think you are as sick as you claim to be."); ECF 41-3 at 15 ("You keep changing your story and symptoms. We cannot rely on your anymore."); ECF 41-8 at 4 ("Now you say you are starving; before you were nauseated. Please keep your story straight so we can help you better in your medical needs."). Further, Dr. Antola told Plaintiff that he was

---

[3] Plaintiff argues that Dr. Antola's failure to revisit her original differential diagnosis, which included bowel obstruction, indicates that she was deliberately indifferent. Viewing the evidence in the light most favorable to the non-moving party, the record shows that Dr. Antola did not revisit the possibility of a bowel obstruction because she believed Plaintiff's symptoms were inconsistent with such a diagnosis. *See* ECF 41-1 at 9, 11; ECF 45-8 at 20:5-9. Although the parties' expert witnesses disagree about whether Dr. Antola's failure to rule out a bowel obstruction fell below the standard of care, none of them state that the failure constituted deliberate indifference. ECF 45-10 at 6:16-25, 14:21-25; ECF 47-1 at 6; ECF 47-3 at 3.

making himself sick. ECF 41-3 at 2 ("When we treat you for your condition . . . you become upset and throw your food away."); ECF 41-3 at 15 ("You've been told twice by the nurse and now myself not to use milk of magnesia—you keep making yourself sick with that . . . ."); ECF 41-2 at 5 ("I told [Plaintiff that his symptoms were likely] due to his elevated blood sugar since he refused his diabetic tray and other treatment.").

During her deposition, Dr. Antola reiterated that at the time she was seeing Plaintiff she believed he was exaggerating his symptoms and was exacerbating his condition by his own conduct. *See* ECF 41-1 at 8 ("I'm not saying that he's not vomiting . . . he's maybe a little more dramatic than what it could be."); ECF 41-1 at 12 ("[W]hen we can monitor what he eats, he does okay."). Dr. Antola also regularly reviewed inmates' medical charts. ECF 41-1 at 3; ECF 45-8 at 8:11-13. Plaintiff's chart contained reports indicating that the other staff also believed Plaintiff's complaints were related to his refusal to follow his diabetic diet. *See* ECF 41-2 at 9 (noting Plaintiff complained of abdominal pain after "his Block went to the yard where commissary food items can be obtained"); ECF 41-2 at 11 ("[Plaintiff] did not start complaining of stomach pain until coming back from yard" after he "had a candy bar."); ECF 45-9 at 4 (Plaintiff told the deputy "my stomach is about to blow up," and the deputy reported that he had observed "a 'Grandma's Double Fudge Brownie' cookie wrapper on the shelf above [Plaintiff's] sink").

Plaintiff argues that Dr. Antola refused to treat Plaintiff between March 13 and March 25 in retaliation for his uncooperative behavior and for calling her a "quack." Plaintiff says that Dr. Antola only saw him on March 26 because he sent a kite on March 23 in which he apologized for his behavior. *See* ECF 41-8 at 19-20. These are not reasonable inferences to draw from the record. Between March 13 and March 25, Plaintiff went back and forth between

PAGE 11 – OPINION AND ORDER

refusing medical treatment and apologizing for his behavior, and Dr. Antola did not see Plaintiff every time he apologized. Rather, someone from the medical staff saw Plaintiff both times between March 13 and March 25, when Plaintiff asked to see the medical staff. On March 23, Plaintiff asked for "medical attention immediately." ECF 41-8 at 20. When an EMT responded later that day, Plaintiff refused treatment, telling the EMT, "F--- you guys and all this stuff. I'm just going to ride it out. Kiss my ass." ECF 41-2 at 16. On March 25, Plaintiff stated that he "would like to see the Dr." ECF 41-3 at 21. Dr. Antola saw him the next day. ECF 41-3 at 21.

Plaintiff cites several cases from other circuits that suggest that "a medical professional's erroneous treatment decision can lead to deliberate indifference liability if the decision was made in the absence of professional judgment."[4] *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). These cases do not assist Plaintiff. *Johnson* held that "[i]t is not enough to show . . . that a doctor should have known that surgery was necessary; rather, the doctor must know that surgery was necessary and then consciously disregard that need in order to be held deliberately indifferent." *Id.* at 1013. Plaintiff cannot meet the *Johnson* standard for deliberate indifference because Dr. Antola believed that Plaintiff's own conduct was causing his stomach ailment, and there is no evidence that she believed surgery was necessary.[5]

---

[4] Three cases that Plaintiff cites find that a prisoner stated a deliberate indifference claim based on the deliberate withholding of treatment, not on erroneous treatment decisions. *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011) (allegations that medical personnel knew that the prisoner suffered from rheumatoid arthritis, but failed to prescribe medication for the condition for ten months); *Scott v. Ambani*, 577 F.3d 642, 648 (6th Cir. 2009) (allegations that the prisoner's doctor knew that the prisoner had recently received treatment for prostate cancer, but failed to examine the prisoner's painful testicular lump for three months); *Edwards v. Snyder*, 478 F.3d 827, 832 (7th Cir. 2007) (allegations that the prisoner's "treatment was unnecessarily and deliberately withheld for no better reason than to accommodate his doctor's holiday plans"). Plaintiff presents no evidence that Dr. Antola deliberately withheld treatment that she knew Plaintiff needed.

[5] Plaintiff argues that Dr. Antola had to know about the severity of his condition because of the non-medical kite sent on March 17 from his fellow inmates saying he was tracking feces

PAGE 12 – OPINION AND ORDER

In many of the cases that Plaintiff cites, doctors refused to conduct necessary tests or alter an inadequate treatment regimen for several months or even years, despite the prisoner's consistent complaints. *See, e.g.*, *Greeno v. Daley*, 414 F.3d 645, 649-51 (7th Cir. 2005) (prisoner complained of heartburn and vomiting from December 1994 until April 1997, when doctors performed an endoscopy and found a distal ulcer in his esophagus); *McElligott v. Foley*, 182 F.3d 1248, 1252 (11th Cir. 1999) (prisoner complained of abdominal pain for six months until doctors performed tests and discovered an intestinal obstruction). In contrast, Plaintiff was incarcerated for less than a month and voiced inconsistent complaints to Dr. Antola. Dr. Antola attempted to treat Plaintiff's blood sugar, but Plaintiff repeatedly refused to cooperate with treatment. When Plaintiff continued to complain of stomach problems, Dr. Antola ordered blood tests on March 26 to determine if there was another cause for Plaintiff's problems.[6]

In the cases cited by Plaintiff that concerned shorter term medical crises, there were other facts in the record suggesting that the doctor was subjectively aware of the prisoner's serious medical need. *See Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 546-52 (6th Cir. 2009)

---

everywhere. *See* ECF 50-1. Unlike several of Plaintiff's kites sent on a "non-medical request form," the non-medical kite sent by his fellow inmates does not note that it was forwarded to medical. *Compare* ECF 50-1 *with* ECF 41-8 at 1-3, 6-9, 11-15, 17-20. Further, Dr. Antola did not recall seeing the kite in Plaintiff's medical file at any point. ECF 45-8 at 27:3-4, 28:3-6. Plaintiff offers no evidence that any Jail medical staff saw the kite around the time the inmates sent it. Instead, Plaintiff offers evidence from the deposition of a Jail deputy who agreed that he would expect such a kite to be given to medical. *See* ECF 45-13 at 3:18-21. Even if Dr. Antola would have seen this kite, Plaintiff offers no evidence that it shows intestinal or bowel blockage.

[6] Plaintiff argues that Dr. Antola's failure to test for pancreatitis demonstrates her deliberate indifference. On March 15, Nurse Hausler noted that Dr. Antola "mentioned possibly doing bloodwork next week to [check] for possible pancreatitis [because of patient's history] of drug abuse." ECF 41-2 at 9. Defendant's expert witness, Dr. Andrew Cramer, noted that acute pancreatitis is urgent and dangerous, and that a doctor suspecting a patient suffers from acute pancreatitis would not wait a week to test for it because the patient could die. *See* ECF 45-11 at 16:18-17:23. Mild or chronic pancreatitis is not as urgent or dangerous, however. *See* ECF 45-11 at 16:1-16, 17:17-23. Plaintiff offers no evidence that Dr. Antola believed that Plaintiff had acute pancreatitis and failed to treat it timely. *See* ECF 41-2 at 9.

PAGE 13 – OPINION AND ORDER

(affirming the district court's denial of summary judgment for the nurse-defendant when she allowed a prisoner to return to and remain in his housing unit despite the fact that she knew the housing units were not air-conditioned, the prisoner had been exercising outside on a hot summer day, the prisoner had vomited during her examination of him, and staff had informed her that the prisoner was suffering from heat exhaustion and had passed out in his cell); *Hayes v. Snyder*, 546 F.3d 516, 525-26 (7th Cir. 2008) (reversing summary judgment for a doctor where the doctor, who oversaw the prisoner's treatment for painful testicular cysts, ignored requests from other physicians to send the prisoner to a urologist and stated in deposition that he would not send a prisoner to a specialist unless he already knew the cause of the prisoner's pain).

In contract, Plaintiff presents no evidence that Dr. Antola knew why Plaintiff had severe stomach problems or that she deliberately avoided discovering the cause. On the contrary, Plaintiff arrived at the Jail with stomach problems, and Dr. Antola proceeded to treat him for high blood sugar in light of his history of diabetes. Plaintiff repeatedly refused to follow Dr. Antola's treatment regimen, interfering with Dr. Antola's ability to discover the cause of Plaintiff's stomach pains and problems. ECF 41-2 at 5-6; ECF 41-4 at 1-2. Moreover, unlike the doctor in *Hayes*, Dr. Antola examined Plaintiff four times during the month that he was at the Jail. ECF 41-2 at 1, 5, 12, 17-18.

Construing the record in the light most favorable to Plaintiff, no rational trier of fact could conclude that Dr. Antola was subjectively aware that while Plaintiff was under her care he had a serious medical need that she was not already attempting to treat. Thus, the Court grants summary judgment against Plaintiff's Section 1983 claim, alleging deliberate indifference.[7]

---

[7] Because the Court finds no evidence of Dr. Antola's deliberate indifference, it need not consider Defendants' argument that the applicable statute of limitations bars Plaintiff's Section 1983 claim.

PAGE 14 – OPINION AND ORDER

B.  **Oregon Medical Negligence Claim**

Defendants argue that they are entitled to summary judgment against Plaintiff's negligence claim because it is barred by the applicable two-year statute of limitations. Defendants contend that Plaintiff's claim is barred because Plaintiff knew or reasonably should have known of his injury by medical negligence before March 27, 2013. Plaintiff responds that the statute of limitations did not begin to run until March 27, 2013, either because Plaintiff did not know of his injuries until he left the Jail and went to the hospital or because Defendants' actions constituted a continuing tort that ended when he left the Jail.

Medical negligence claims must be brought "within two years of when the injury is first discovered or in the exercise of reasonable care should have been discovered." Or. Rev. Stat. § 12.110(4). The Oregon Supreme Court has interpreted the term "injury" to mean a "legally cognizable harm," which includes "three elements: (1) harm; (2) causation; and (3) tortious conduct." *Greene v. Legacy Emanuel Hosp. & Health Care Ctr.*, 335 Or. 115, 120-21 (2002). "Therefore, the statute of limitations begins to run when the plaintiff knows or in the exercise of reasonable care should have known facts which would make a reasonable person aware of a substantial possibility that each of the three elements . . . exists." *Gaston v. Parsons*, 318 Or. 247, 256 (1994). "Assurances made by the attending physician may also have a bearing on whether a reasonable person would be aware of a substantial possibility of tortious conduct." *Id.* at 257. "If the physician makes a representation on which a plaintiff reasonably relies, it could have the effect of delaying a reasonable person from becoming aware of a substantial possibility of tortious conduct." *Id.*

Plaintiff arrived at the Jail feeling sick and thought that he had food poisoning. ECF 45-1 at 9:15-18. During his incarceration, Plaintiff considered other causes for his continued sickness, including, the water in his cell, poisoning by the Jail's staff, eating solid food, and constipation.

PAGE 15 – OPINION AND ORDER

ECF 41-3 at 4, 10-11, 15; ECF 41-2 at 15. Dr. Antola and other medical staff repeatedly told Plaintiff that he was exaggerating his symptoms and causing himself to feel sick. ECF 45-1 at 18:15-19; ECF 41-3 at 2, 15; ECF 41-2 at 16; ECF 41-8 at 4. Plaintiff could reasonably have relied on the medical staff's insistence that the cause of his symptoms was his uncontrolled blood sugar and attempts to self-treat his condition. *Gaston*, 318 Or. at 257. Until Plaintiff was taken to the hospital and treated on March 27, 2013, Plaintiff did not know that he had a bowel obstruction. *See* ECF 45-1 at 23:12-19. Viewing the evidence in the light most favorable to Plaintiff, he did not know that he had a serious medical condition that was not being properly treated by Jail staff until shortly after he was released.

Additionally, a reasonable person in Plaintiff's position could not have made any further inquiry into his medical condition or whether his treatment was appropriate. An incarcerated individual does not have the luxury of seeking a second opinion. In fact, Plaintiff asked several times to be taken to the hospital and was refused. *See* ECF 41-2 at 11-12; ECF 41-5 at 5; ECF 41-7 at 2; 4, ECF 45-1 at 11:24-12:1, 24:10-12. The record also indicates that the severity of Plaintiff's bowel obstruction could not have been known until surgery was performed and a portion of his small bowel was tested. *See* ECF 45-15 at 4; ECF 45-16 at 3; ECF 45-10 at 8.

Defendants argue that Plaintiff's negligence claim accrued as early as March 15, 2013, when Plaintiff knew of the severity of his injury after he was found in the "rescue position" with "vomit going down his blanket across his bed and to the floor." ECF 41-2 at 10. On March 15, however, Plaintiff did not know who or what was causing his pain. Plaintiff continued to have several theories, some of which had nothing to do with the medical staff. Viewing the record in the light most favorable to Plaintiff, a rational juror could conclude that Plaintiff did not and could not have discovered his legal injury until he left the Jail on March 27, 2013. There is a

PAGE 16 – OPINION AND ORDER

genuine dispute of material fact as to when Plaintiff's medical negligence claim accrued and thus whether the two-year statute of limitations bars that claim. Accordingly, the Court denies Defendants' motion for summary judgment against Plaintiff's medical negligence claim.

## C.  Supplemental Jurisdiction

Because the Court dismisses Plaintiff's Section 1983 claim, the only claim over which the Court had original jurisdiction, the Court may decline to exercise supplemental jurisdiction over Plaintiff's Oregon medical negligence claim. *See* 28 U.S.C. § 1367(c)(3). In this case, the Court retains jurisdiction over Plaintiff's negligence claim. *Nishimoto v. Federman-Bachrach & Assocs.*, 903 F.2d 709, 715 (9th Cir. 1990) (holding that "[d]ismissal of the federal claims does not deprive a federal court of the power to adjudicate the remaining pendent state claims"). This lawsuit was filed in March 2015. Thorough discovery has been taken and completed, and it is now time to bring this dispute to trial. The interests of judicial economy, convenience, fairness, and comity all weigh in favor of exercising jurisdiction over Plaintiff's state claim.

## CONCLUSION

Defendants' Motion for Summary Judgment (ECF 40) is GRANTED in part and DENIED in part. Plaintiff's Section 1983 claim is dismissed, but Plaintiff's negligence claim may proceed.

**IT IS SO ORDERED**.

DATED this 20th day of March, 2017.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge